ALICE M. HUNN, ADMINISTRATRIX, ETC., v. THE MICH-
IGAN CENTRAL RAILROAD COMPANY.

*Railroad companies—Negligence—Train dispatchers—Vice-principal
—Contributory negligence of fellow-servant—Evidence—
Mortality tables—Damages.*

1. A train dispatcher who has absolute control over a division of a railroad, so far as the running and operating of trains is concerned, is not a "fellow-servant" with other employés acting under his orders.[1]

   So *held*, where, by reason of the failure of a train dispatcher to notify one of two engineers of the meeting point established for two engines, and to order one of them held at such point, a collision occurred, and the fireman on one of the engines was killed; and in a suit to recover damages under the statute the railroad company defended on the ground that the train dispatcher and fireman were fellow-servants.

2. Contributory negligence to defeat a right of action must be that of the party injured.

[1]See *Van Dusen v. Letellier*, 78 Mich. 492; *Harrison v. Railroad Co.*, 79 Id. — (44 N. W. Rep. 1034).

78 MICH—33.

So *held*, where the court was requested to charge the jury that although they might find the defendant guilty of negligence, yet, if the fellow-servant of the deceased contributed to produce his death, the plaintiff could not recover, which request is held to have been rightly refused.

3. Where in a railroad negligence case the defendant claims contributory negligence of the fellow-servant of the deceased in running the trains in violation of the rules of the company as to speed, testimony is admissible on the part of the plaintiff tending to show that a strict compliance with the rules was impracticable, and that they were obeyed as nearly as possible and run the trains on the schedule time fixed by the company.

4. The mortality tables contained in How. Stat. § 4245, show the probable life expectancy of a healthy person, whose age is given, but are not conclusive evidence; and when offered in connection with proof of the physical condition of the deceased at time of his death, and all testimony which may reasonably affect his duration of life, the jury must determine from *all* of the testimony before them such probable duration of life had the deceased not died as a result of the injury complained of.[1]

5. Whether damages found by a jury are excessive or not does not present a question of law. If no improper testimony affecting the subject of damages has been admitted, and the court has given to the jury proper instructions to guide them in reaching a conclusion, the amount of damages awarded is beyond the reach of a writ of error.

6. Evidence of the pecuniary means of the husband at time of his death is inadmissible in a suit to recover damages for the loss sustained by such death, alleged to have been caused by the negligence of the defendant.

7. A declaration which states a cause of action and is not demurred to is sufficient after verdict.

8. The following propositions are summarized from the opinion of Mr. Justice CHAMPLIN:

*a*—This Court long ago announced and has steadily adhered to the doctrine that a master is not liable to a servant for injuries received through the negligence of a fellow-servant while engaged in a common employment. *Railroad Co. v. Leahey*, 10 Mich. 193; *Davis v. Railroad Co.*, 20 Id. 105; *Railroad Co. v. Dolan*, 32 Id. 510; *Railroad Co. v. Austin*, 40 Id. 247; *Mining Co. v. Kitts*, 42 Id. 34; *Day v. Railway Co.*, Id.

---

[1] See *Rajnowski v. Railroad Co.*, 74 Mich. 21 (head-note 7), excluding such tables where the deceased was under ten years of age.

523; *Railroad Co. v. Smithson*, 45 Id. 212; *Railroad Co. v. Gilbert*, 46 Id. 176; *Smith v. Potter*, Id. 258; *Henry v. Railway Co.*, 49 Id. 495; *Greenwald v. Railroad Co.*, Id. 197; *Ryan v. Bagaley*, 50 Id. 179; *Gardner v. Railroad Co.*, 58 Id. 590.

*b*—Perhaps no satisfactory rule has yet been formulated by which it may in all cases be determined *who* are fellow-servants, in such sense as to shield the master for the negligence of his servant. We may start, however, where the rule is clear that a master is liable to his servant for an injury caused by his own negligence.

*c*—The master may not choose to give his personal attention to his business, and may desire to put another in his place, to manage and control it for him as fully as he might do if personally present. Such person is his *alter ego* (another self), and the master is as responsible for his acts of omission and commission, while engaged in the business intrusted to him, as if he did such acts himself.

*d*—It is the duty of the master to supervise, direct, and control the operations and management of his business, so that no injury shall ensue to his own employés through his own carelessness or negligence in carrying it on, or else to furnish some person who will do so, and for whom he must stand sponsor. This is true of natural persons, and it is especially true of corporations, who can only act through natural persons.

*e*—Whenever the business conducted by a person selected by the master is such that he is invested with full control (subject to no one's supervision except the master's) over the action of the employés engaged in carrying on a particular branch of the master's business, and, acting upon his own discretion, according to general instructions laid down for his guidance, it is his province to direct, and the duty of the employés to obey, then he stands in the place of the master, and is not a fellow-servant with those whom he controls. *Mining Co. v. Kitts*, 42 Mich. 39.

Error to Jackson. (Peck, J.) Argued October 31, 1889. Decided December 28, 1889.

Negligence case. Defendant brings error. Reversed. The facts are stated in the opinion.

*Gibson & Parkinson (H. M. Campbell* and *Ashley Pond,* of counsel), for appellant.

*Hammond, Barkworth & Cobb (Thomas A. Wilson,* of counsel), for plaintiff.

[The points of counsel are so fully stated, and the authorities bearing upon the questions involved so fully reviewed, in the opinion, that a restatement from the briefs of counsel is omitted.—REPORTER.]

CHAMPLIN, J. About 3 o'clock on the morning of December 30, 1885, engine No. 120, with a way-car, under the charge of W. D. Loomis as conductor, and Samuel Maitland as engineer, and George Hunn as fireman, left Bay City, going south, with orders to run wild to Rives Junction, over the Jackson, Lansing & Saginaw Railroad, leased and operated by the defendant company. On the same morning engine No. 177, without any train, was proceeding north over the same road, under the charge of Nelson Napier as conductor, Robert Mills, engineer, and Thomas Looney, fireman. Both engines were run under orders by telegraph from one Kilmer, a train dispatcher, of Bay City. It was the duty of Kilmer, as train dispatcher, to establish a meeting point for these two engines, under a rule adopted by the defendant company, which reads as follows:

"Rule 133. When an order is given by telegraph for two or more trains to meet at a station, the train dispatcher must first order the green signal displayed at such meeting point by the operator, and receive assurance from him that the signal has been displayed before giving orders to either train. In ordering one train held for another, the dispatcher will order each train held for the other."

Kilmer established such meeting point at Saginaw City, and notified engine No. 120 of that fact, but neglected to notify engine No. 177, and gave no order to hold this engine at that point. Napier, the conductor of 177, reached Saginaw City and saw the green signal, and found

the order there to hold W. D. Loomis, conductor of No. 120, but no order for himself. He received his clearance, and proceeded north three or four miles, and met engine No. 120, upon a curve, at about 3:20 A. M. The respective engines were running at from 10 to 12 miles an hour. The collision resulted fatally to Hunn. At the time a thick fog was prevailing, the night was dark, and the view at the curve was obstructed by houses and other objects, which prevented the approaching engines from being seen from each other a distance of from three to four car-lengths. The accident occurred within the limits of the Saginaw yards. The time card rule, which was well known to all employés of the company, required that—

"Trains will run carefully, and under full control, through all yards, and irregular trains must keep sharp lookout for switching engines."

The plaintiff recovered a judgment in the court below, and the defendant asks its reversal upon several grounds, the principal of which are the following:

1. The declaration was insufficient, in not setting forth with more particularity the duty of the defendant, the breach of duty which caused the accident, and the cause of the accident.

2. The only negligence proved upon the trial was that of the train dispatcher, and no recovery can be had, for the reason that his negligence was that of a fellow-servant.

3. The testimony relative to damages, and the charge of the court in reference thereto, were erroneous.

The declaration was not demurred to. It states a cause of action, and is sufficient after verdict.

The second ground above stated, if sustained, prevents a recovery in the action, and raises the most important point in the case. This Court long ago announced and has steadily adhered to the doctrine that a master is not liable to a servant for injuries received through the negli-

gence of a fellow-servant while engaged in a common employment. *Mich. Cent. Railroad Co. v. Leahey,* 10 Mich. 193; *Davis v. Railroad Co.,* 20 Id. 105; *Mich. Cent. Railroad Co. v. Dolan,* 32 Id. 510; *Mich. Cent. Railroad Co. v. Austin,* 40 Id. 247; *Quincy Mining Co. v. Kitts,* 42 Id. 34 (3 N. W. Rep. 240); *Day v. Railway Co.,* Id. 523 (4 N. W. Rep. 203); *Mich. Cent. Railroad Co. v. Smithson,* 45 Id. 212 (7 N. W. Rep. 791); *Mich. Cent. Railroad Co. v. Gilbert,* 46 Id. 176 (9 N. W. Rep. 243); *Smith v. Potter,* Id. 258 (9 N. W. Rep. 273); *Henry v. Railway Co.,* 49 Id. 495 (13 N. W. Rep. 832); *Greenwald v. Railroad Co.,* Id. 197 (13 N. W. Rep. 513); *Ryan v. Bagaley,* 50 Id. 179 (15 N. W. Rep. 72); *Gardner v. Railroad Co.,* 58 Id. 590 (26 N. W. Rep. 301). The rule is a salutary one in all cases of fellow-servants where the master has exercised due care in the selection of competent employés, and has become pretty generally recognized by the courts of last resort in this country. But the question of who are fellow-servants still perplexes the judicial mind, and gives rise to a great diversity of opinion. Some courts go so far as to hold that, if the master exercises due care in selecting employés, his full duty towards his servants is discharged, even though he selects one or more agents to represent him in overseeing, controlling, and carrying on the business, however large and extended it may be, if he retains the right of employing and discharging his servants. Others hold that so long as they are employed and paid by the same master, and are engaged in a common enterprise, they are fellow-servants. But this is the extreme, and denies substantially all liability of the master in a vast majority of cases where enterprises of any considerable magnitude are carried on.

Perhaps no satisfactory rule has yet been formulated by which it may in all cases be determined who are fellow-servants, in such sense as to shield the master for the neg-

ligence of his servant. We may start, however, where the
rule is clear that a master is liable to his servant for an
injury caused by his own negligence. The master may
not choose to give his personal attention to his business,
and may desire to put another in his place, to manage
and control it for him as fully as he might do if person-
ally present. Such person is his *alter ego*, and the master
is as responsible for his acts of omission and commission,
while engaged in the business entrusted to him, as if he
did such acts himself. It is the duty of the master to
supervise, direct, and control the operations and man-
agement of his business, so that no injury shall ensue to
his employés through his own carelessness or negligence.
in carrying it on, or else to furnish some person who will!
do so, and for whom he must stand sponsor. This is true-
of natural persons, and it is especially true of corpora-
tions, who can only act through natural persons. When-
ever the business conducted by the person selected by the
master is such that the person selected is invested with
full control (subject to no one's supervision except the
master's) over the action of the employés engaged in car-
rying on a particular branch of the master's business, and,
acting upon his own discretion, according to general
instructions laid down for his guidance, it is his province-
to direct, and the duty of the employés to obey, then he-
stands in the place of the master, and is not a fellow-
servant with those whom he controls. In *Quincy Mining*
*Co. v. Kitts*, 42 Mich. 39, this Court said:

"This duty of due care in the employment and reten-
tion of competent servants is one the master cannot
relieve himself of by any delegation, and, if it becomes
necessary to intrust its performance to a general mana-
ger, foreman, or superintendent, such officer, whatever
he may be called, must stand in the place of his princi-
pal, and the latter must assume the risks of his negli-
gence. The same is true of the general supervision of
his business. If there is negligence in this, the master

is responsible for it, whether the supervision be by the master in person, or by some manager, superintendent, or foreman to whom he delegates it. In other words, while the servant assumes the risk of the negligence of fellow-servants, he does not assume the risk of negligence in the master himself, or in any one to whom the master may see fit to intrust his superintending authority."

It was upon this principle that in *Ryan v. Bagaley*, 50 Mich. 179, this Court held the owner of a mine liable for the negligence of the mining captain. The question was made to turn upon whether the mining captain was intrusted with the management of the mine without interference. If he was, in respect to legal accountability, his negligence was the negligence of the defendant.

It now becomes pertinent to inquire what the duties of Kilmer, the train dispatcher whose negligence caused the death of the fireman, Hunn, were. The division superintendent's name was W. A. Vaughn. In receiving dispatches from the train dispatcher, the conductors and engineers never act upon them unless signed with the initials "W. A. V." Dispatches delivered by the operator so authenticated were considered authoritative, and were acted upon. Mr. Haire, was the chief train dispatcher at Bay City, and he had six train dispatchers under his supervision in the Bay City office, only one of whom, however, was on duty at a time. He testified that the train dispatchers signed the initials "W. A. V." to their dispatches, and were authorized to do so, and that the division superintendent, Mr. Vaughn, never sees them at all, and knows nothing about them, and does not even know the instructions in regard to train dispatchers. He was asked:

" *Q.* Who has the control of trains on the Jackson, Lansing & Saginaw division, or who did have at the time of this accident?

" *A.* Mr. Kilmer, in regard to moving them backwards and forwards; the entire charge at that time; nobody else has any right to interfere."

He further testified that no more than one person has control of the trains at any one time, and no other train dispatchers would have the right to interfere, not even the division superintendent, or the superintendent or the president of the company, unless they wanted to relieve the train dispatcher themselves. If they wanted to take his program, and sign it, by these orders they could do so; they have the authority. They would have to receipt for it, and take upon themselves the duties. Rule 124 of the company reads as follows:

" The general and assistant general superintendent, the division superintendents,. and the train dispatchers on duty are the only persons authorized to move trains by special order, and but one person on the same circuit shall be permitted to move trains by special order at the same time."

Rule 127 is as follows:

." The train dispatcher on duty will have full power to run any train or engine by telegraph that he may think proper. No irregular train or engine will be allowed to run upon the road, either upon a single or double track, without his knowledge and instructions, unless they can follow a regular train under a red flag, and then only to a station where they can obtain an order," etc.

Mr. Vaughn, the division superintendent over this division of defendant's road, testified as follows:

" *Q.* Do you do the dispatching or the giving of orders for the running of trains upon the road?

" *A.* I don't.

" *Q.* In the system of doing business upon your road, what persons—I do not refer to their names—but what persons have charge in telegraph management of trains,— had at that time.

" *A.* The train dispatcher.

" *Q.* When a train dispatcher is engaged in the duty of

dispatching trains upon the line, what other persons have rights or powers there, so far as interfering.

"*A.* No other."

It is thus seen that the train dispatcher has absolute control over the division of the road from Rives Junction to Mackinaw, so far as the running and operating of trains thereon is concerned. It is his province to direct, and it is the duty of all employés operating trains to obey. This is the most important branch of the railroad service, and is the highest exercise of the franchise conferred upon railroad corporations. It is the corporation who does it, through the train dispatcher. This officer by rule 124 above quoted, is ranked with the general, the assistant, and the division superintendents, and by rule 127 he is given supreme control. To say that such an official, exercising such control, is a fellow-servant with those whom he directs, ignores all distinctions between master and servant. If his act is not the act of the master, then no railroad corporation ever run or operated a railroad.

In *Darrigan v. Railroad Co.*, 52 Conn. 285, there were two ' irregular trains, going in opposite directions, on the western division of defendant's road, which were run as directed by telegram from the train dispatcher in the division superintendent's office at Hartford. He ordered the east bound train to run to Waterbury until 6 o'clock. Soon after, he was relieved, in the regular course of business, by an assistant, who, a little before five o'clock, sent an order to the west-bound train at Waterbury to run to Brewster's. In obeying this order the trains collided, and the plaintiff was injured. The negligence of the train dispatcher was admitted, but it was claimed by the defendant that such negligence was the negligence of a fellow-servant. In deciding this question, the court said:

"It is immaterial that these men are hired and paid

by a common employer, and that their employment is designed to accomplish one common result. That argument, if pressed to its logical conclusion, would obliterate all distinctions among those engaged in railroad business, from the president down to the humblest servant, and would practically exempt the company from all duty and all liability to those in its service."

·And the court further said:

"Cases are constantly arising, especially in the operation of railroads, which no general rule can provide for, in which the master must be regarded as constructively present, and in which some one must be invested with a discretion and a right to speak and command in his name and by his authority. Such a right carries with it the corresponding duty of obedience,—some one must hear and obey. * * * It must also devise some suitable and safe method by which to run special and irregular trains, and regular trains when off their regular time. * * * Emergencies will arise which no system of rules can anticipate and provide for, in which the company must act, and act promptly and efficiently. In this case the scheme devised was to have these trains controlled by one who knew the position and movement of every train on the road liable to be affected by them, —a train dispatcher, acting in the name and by the authority of the superintendent. Is there not a wide and manifest difference between the duty of such an agent and the duty of a locomotive engineer? The duty of the former pertains to management and direction; that of the latter to obedience."

The case of *Smith v. Railway Co.*, 92 Mo. 359 (4 S. W. Rep. 129), was very similar to the one under consideration, and the supreme court of Missouri held, after a consideration of authorities, that the railroad company was liable for the negligence of its train dispatcher which resulted in the death of one of the servants of the company. The following cases are to the same effect: *Sheehan v. Railroad Co.*, 91 N. Y. 332; *Booth v. Railroad Co.*, 73 Id. 38; *Railway Co. v. Henderson*, 37 Ohio St. 552; *Washburn v. Railroad Co.*, 3 Head, 638; *Railroad Co. v.*

*McLallen,* 84 Ill. 109; *Railway Co. v. Dwyer,* 36 Kan. 58
(12 Pac. Rep. 352); *Railway Co. v. Ross,* 112 U. S. 377
(5 Sup. Ct. Rep. 184); *Phillips v. Railway Co.,* 64 Wis.
475 (25 N. W. Rep. 544); *Railroad Co. v. Kanaley,* 39
Kan. 1 (17 Pac. Rep. 324); *McKinne v. Railroad Co.,* 21
Amer. & Eng. R. Cas. 539; *Gravelle v. Railroad Co.,* 10
Fed. Rep. 711; *Gilmore v. Railroad Co.,* 18 Id. 866; *State
v. Malster,* 12 Reporter, 783; *Murphy v. Smith,* 19 C. B.
(N. S.) 361; *Malone v. Hathaway,* 64 N. Y. 5; *Moran's
Case,* 44 Md. 283; *Flike v. Railroad Co.,* 53 N. Y. 549;
*Dobbin v. Railroad Co.,* 81 N. C. 446; *Cowles v. Railroad
Co.,* 84 Id. 309; *Dowling v. Allen,* 74 Mo. 13.

In holding that the train dispatcher is not a fellow-
servant with the fireman, I do not consider that I run
counter to the doctrine so often recognized by this and
other courts, in relation to fellow-servants, in which,
broadly stated, it is said:

"It is sufficient if they are in the employment of the
same master, engaged in the same common work, and per-
forming duties and services for the same general purposes.
The rule is the same, though the one injured may be in-
ferior in grade, and is subject to the control and direc-
tion of the superior whose act caused the injury, provided
they are both co-operating to effect the same common
object."

This cannot be applied when the superior causing the
injury represents the master, and it is always a subject
of inquiry to ascertain the nature and extent of the
authority of the superior whose negligence caused the
injury. If his authority and duties are such as the mas-
ter must necessarily, either personally or by another,
exercise and discharge, then the above rule does not apply.
There are some authorities which hold that a train dis-
patcher, and those operating trains under his control,
are fellow-servants. It seems to me, however, that those
authorities do not give sufficient prominence to the posi-

tion which the train dispatcher occupies in operating a railroad. He is the corporation for the time being, and exercises powers which neither the superintendent, nor the president, nor any other officer or agent of the corporation, can interfere with.

The defendant requested a charge to the effect that, although the jury might find the defendant guilty of negligence, yet if the fellow-servant of deceased contributed to produce his death the plaintiff could not recover. This request was rightly refused. The correct rule, and the reason for it, is stated in *Paulmier v. Railroad Co.*, 34 N. J. Law, 155, as follows:

"The servant does not agree to take the chance of any negligence on the part of his employer, and no case has gone so far as to hold that where such negligence contributes to the injury the servant may not recover. It would be both unjust and impolitic to suffer the master to evade the penalty for his misconduct in neglecting to provide properly for the security of his servant. Contributory negligence, to defeat a right of action, must be that of the party injured." *Railway Co. v. Cummings*, 106 U. S. 700 (1 Sup. Ct. Rep. 493); *Keegan v. Railroad Corp.*, 8 N. Y. 175; *Railroad Co. v. Swett*, 45 Ill. 197; 2 Thomp. Neg. 981; *Perry v. Lansing*, 17 Hun, 34; *Busch v. Railroad Co.*, 29 Id. 112; *Gray v. Railroad Co.*, 24 Fed. Rep. 168.

The second count of the declaration was based upon the negligence of defendant in employing an incompetent train dispatcher, and quite an amount of testimony was introduced in the case in the effort to prove that fact. But this count, upon an intimation of the court, was practically abandoned. The defendant insists that the testimony introduced under that count remained in the case, and was prejudicial to it. We do not see anything in the testimony upon this branch of the case that could have possibly prejudiced the jury. The testimony introduced tended to show the capability of Kilmer, and the

care and caution exercised by defendant in selecting him for the position. Its tendency was favorable to the defendant.

Under defendant's claim of contributory negligence of fellow-servants running the trains in violation of the rules of the company as to speed, testimony was admitted by the court tending to show that a strict compliance with the rules was impracticable, and that they were lived up to as nearly as they could be, and the trains run on the time allowed by the schedule prepared by the company. We think it was competent to show what was usually and habitually done in the running of trains, because, if the company permitted or had so framed the rules as to require the employés to exercise some discretion in the matter of strict obedience, it ought not to be permitted to hold its employés to the very letter of the rule in order to shield the company from liability for what it had tacitly permitted. But the admission of such testimony could not harm defendant, if it was the company's negligence that was the proximate cause of the injury, although a concurring cause was the negligence of a fellow-servant in running at a greater rate of speed than the rules allowed. The court gave full effect to the rules in his charge to the jury, so far as they were material, by instructing the jury that—

"If you find, as a matter of fact, that the collision resulted entirely from the negligence of one or both of the engineers of engines No. 120 and 177, the defendant is not chargeable with the consequence of that negligence."

There was testimony introduced tending to show that the deceased was earning $900 a year at the time of his death, and was 27 years of age. A witness was then introduced, and he was permitted to testify that he had made a computation of the present value of an annuity

based upon the expectancy of life of a man of the age of 27 years on an income of $900, and that its present value was $10,725.30. The court also, against defendant's objections, permitted the mortality tables found in section 4245, How. Stat., to be admitted in evidence, and the Northampton tables for showing the present value of a dower interest or of an annuity, found upon page 242 of Cheever's Probate Law. Mrs. Hunn also testified that her husband's earnings were her only means of support; that he owned a place at the time worth about $2,000. She was also permitted to testify, against defendant's objections, that there was an incumbrance upon the place of $1,100 or $1,200.

There was also considerable testimony introduced as to his physical health, and as to his being afflicted with varicose veins, and varicose tumors, and how such disease would impair his health, or affect the probable duration of his life. Upon the question of damages the court, among other things, instructed the jury as follows:

"Now, in estimating her pecuniary loss, you should consider the personal character of her deceased husband, as shown by the evidence; his mental and physical capacity; his habits as to industry, economy, or otherwise; his health,—whether at the time of his death he was afflicted with any disease, or physical infirmity, as varicose veins, which would be likely to reduce his earning power in the future, or shorten his life; consider his capacity, disposition to earn money, as shown by the evidence; the salary he was then earning, and the amount, whether greater or less, which, under the testimony, you think he would, with reasonable probability, be likely to earn in the future; the probable length of time he would continue to live, and earn money, and furnish his wife with support, or other pecuniary advantages; and for this purpose you may consider the evidence of the mortuary tables, or expectancy of life, given you from the statute by Mr. Birney, considering, in the same connection, how much that natural expectancy for the life of a man might be reduced by the circumstances of his physical infirmity of varicose

veins, as shown by the evidence. But you must not consider Mr. Birney's computation, based upon the annuity tables, of how much money it would take to purchase an annuity, as testified to by him. That evidence I understand to have been withdrawn from your consideration. At all events, gentlemen, you will give it no weight in determining you verdict. These, and all other facts, conditions, and circumstances appearing in the evidence, which tend to throw light upon or aid you in reaching a fair and just conclusion as to the amount of her pecuniary loss, you may and should consider in making up your verdict. Now, the pecuniary benefits which Alice M. Hunn would, with reasonable probability, have realized, by being his wife during the length of time that relation would have continued if he had lived, she has lost by his death; and these benefits, fairly and justly estimated by you with reference to their pecuniary value, under all the evidence in the case and the instructions I have given you, will furnish the measure of her pecuniary injury in this case. The question is not what he might have earned or saved if he had lived, but it is what she, as his wife, would have realized if his death had not occurred from the collision."

The mortuary tables contained in Howell's Statutes were properly admitted in evidence, as some testimony tending to show Hunn's expectancy of life at the age of 27. *Balch v. Railroad Co.*, 67 Mich. 394 (34 N. W. Rep. 884). Such tables are not conclusive. They show the probable age which a healthy person may expect to reach, whose age is given. But when that is before the jury, and the physical condition of the person at the time of his death, and all testimony which may reasonably affect his duration of life, the jury must determine from the testimony before them the probable duration of decedent's life had he not died as a result of his injury.

The testimony of Birney was properly excluded, and the jury told not to regard it. His figures showed the value of Hunn's life to be $10,725.30.

The jury found the plaintiff's damages to be $7,575, and this sum the defendant's counsel insist is excessive.

Whether damages found by a jury are excessive or not does not present a question of law. If no improper testimony affecting the subject of damages has been admitted, and the court has given to the jury proper instructions to guide them in reaching a conclusion, the amount of the damages awarded is beyond the reach of a writ of error.

The court erred in admitting testimony showing the extent of their means, and the incumbrance upon the land. When the question was objected to, the court said he would admit it as showing the extent of their means. In *Chicago & N. W. Railway Co. v. Bayfield*, 37 Mich. 214, Mr. Justice COOLEY says:

"What the family would lose by the death would be what it was accustomed to receive, or had reasonable expectation of receiving, in his life-time; and to show that the family was poor has no tendency towards showing whether this was, or was likely to be, large or small. One man contributes liberally in aid of his poor relations, another delights in contributing luxuries where comforts are already abundant, but when the contribution is cut off in either case the extent of the loss is not measured by the wealth or poverty of the recipient, but by the contribution itself. A dollar lost, whether by a poor man or rich man, is neither more nor less than a dollar, and a reasonable expectation of benefit to a certain amount must, when lost, be compensated to the same extent, whether the loser be rich or poor."

We cannot say that this testimony did not influence the jury. It was admitted as having some bearing upon the measure of damages, and it must be presumed that it formed an element in the estimation of damages by the jury.

The instruction to allow merely nominal damages, so far as the brother and sisters were concerned, was correct. *Railroad Co. v. Shannon*, 43 Ill. 338; *Railroad Co. v. Swett*, 45 Id. 205.[1]

---

[1] The court instructed the jury that under the evidence no basis was furnished to justify them in finding any substantial sum as damages for the brother or sisters.

For the error pointed out the judgment must be reversed, and a new trial granted.

SHERWOOD, C. J., MORSE and CAMPBELL, JJ., concurred. LONG, J., did not sit.