### JOHNSON *v.* BURKE.[1]

1. APPEAL AND ERROR—DIRECTING VERDICT—EVIDENCE.

In reviewing, on a writ of error, a verdict directed against plaintiff, his evidence is to be considered in its aspect most favorable to plaintiff.

2. MASTER AND SERVANT—VIOLATION OF RULES—RISK ASSUMED—ABROGATION OF RULES.

If a rule or notice is habitually violated by employés, with the knowledge or acquiescence of the employer, or is not enforced, it may be treated as abrogated.[1]

3. SAME—NOTICES—DANGEROUS ELEVATOR.

Where notices of danger had been posted for several months, but were removed and employés permitted to use the defendant's elevators by the direction of the employer, an employé did not assume the risk of the absence of a clamp necessary to prevent the elevator from falling, but which he knew nothing about, being ignorant of the dangerous condition of the elevator.   (Distinguishing *Bennett* v. *Butterfield*, 112 Mich. 96 [70 N. W. 410], and *Ball* v. *Hauser*, 129 Mich. 397 [89 N. W 49]).

[1] Duty of servant in regard to rules promulgated by his employer, see note in 43 L R A. 350.

4. VENUE—RESIDENCE OF PARTIES—ACTIONS—TRANSITORY ACTION
   —WAIVER OF WANT OF JURISDICTION.
   After defendant, in a transitory action, has pleaded in bar of
   the action, thus submitting to the jurisdiction of a court of
   general jurisdiction, he must be held to have waived the
   question of jurisdiction of the person, where it is raised on
   the ground that neither party resided in the county in which
   the action was brought. 3 Comp. Laws, § 10126.

Error to Ingham; Collingwood, J. Submitted June
27, 1911. (Docket No. 108.) Reargued October 16,
1911. Decided November 3, 1911.

Case by William Johnson against William Burke for
personal injuries. A judgment for defendant on a ver-
dict directed by the court is reviewed by plaintiff on writ
of error. Reversed.

*Henry R. Rathbone* and *Charles H. Goggin*, for ap-
pellant.

*Thomas, Cummins & Nichols*, for appellee.

STONE, J. This is an action on the case to recover
damages for a personal injury received by the plaintiff
while in the employ of the defendant. The plaintiff en-
tered the employment of the defendant in September,
1909, and the injury occurred on April 2, 1910.

The defendant was engaged in constructing a high school
building in the city of Lansing. At the time of the injury
complained of, the structure was erected and inclosed, and
it was being finished on the inside. The dimensions of the
building were about 150 feet by 60 feet, and about 50 feet
high. There was a basement with two floors above. The
plaintiff was employed as a laborer in wheeling and han-
dling material, and he appears to have assisted in the work
as directed by his superiors. A double hoist freight ele-
vator was placed and used in the building at the time,
located in the center wellhole. It had earlier in the work
been located in the south part of the building. This

appliance was so constructed that while one elevator was going up the other would be coming down. These elevators ran between upright posts, which extended to the top story, and acted as guides. They were joined together by a continuous wire cable, which was coiled about a winch, and then ran over a pulley at the top of the building. One end of this cable was fastened to the framework of the north elevator, and the other end to the framework of the south elevator. The whole was operated by an electric engine, which an engineer controlled by means of a lever and brake.

Both ends of the cable had been secured, up to a short time before the accident, by clamps. This was done by running the end of the cable through an eye at the top of the elevator, doubling it back, and securing it by adjusting and screwing on the clamp or clip provided for that purpose. On the south elevator, this continued to be the method used for securing the elevator, but on the north elevator there was also another device, consisting of a horizontal spindle on top of the frame, around which the end of the cable was coiled, after having been passed through or around a hook at the end. At one end of the spindle, there was a small iron wheel with teeth, into which a metal dog dropped to prevent the cable from unwinding on the spindle, and thereby permitting the elevator to fall. The evidence of the plaintiff tended to show that if the dog was not tight, or did not fit properly, it could be thrown out of place by any slight jar, and that then the elevator would fall, because of the unwinding of the cable. The evidence on the part of the plaintiff tended to show that to prevent such falling a clamp had been also used on the end of the cable attached to the north elevator, as well as to the one attached to the other. Some three or four days before the injury to the plaintiff, however, a new cable had been installed, and, although the clamp had been put on the end of the cable at the south elevator, no clamp was attached to the end of the

cable on the north elevator, and the hoist was continued in operation without this safety device.

These elevators were used continuously, not only for the transportation of material, but of the men who were handling it. A number of witnesses testified that the defendant was there every day superintending the work; that while he was there the men were in the habit of riding on the elevators; and that defendant never made any objection to their so doing. There was testimony that the plaintiff and other men had been directed by the defendant to ride on the elevator, when it was in the other part of the building. After such direction, the plaintiff and other employés continued to ride up and down on the elevators while about their work. This continued up to within a week of the accident, but for about that length of time before he was injured the plaintiff's duties confined him to the basement of the building, where he was assisting the carpenters, and he had no occasion to ride, and he did not ride on the elevators during that week. The plaintiff testified that he did not ride on either of the elevators after the clamp had been removed and the new cable installed until the time when he was injured. He testified that he knew nothing about the elevators, or of their safety devices, had never worked on them before said employment, nor been warned of any danger by defendant personally, and that he did not even know of the change of cables, or of the clamp being left off, and that he had no reason or occasion to know of any danger.

It appeared in evidence that at one time there had been two cards posted on the guideposts of the elevators, on which were printed the words: "Danger. Keep off." The evidence was that they were put there about Christmas, and continued until about March 1st, when they were removed. At no time thereafter were they again posted. It further appeared that the men rode up and down on the elevators, and used them as freely during the time that these signs were up as they did before and after, and this to the knowledge of the defendant. The cards

had been removed for at least two or three weeks before the injury to the plaintiff.

It appeared in evidence that on the morning of the day of plaintiff's injury the regular engineer, discovering that the dog was loose on the north elevator, was trying to fix it by putting on a clamp, when defendant came along and asked him what he was doing, and when told by the engineer of its condition, and that it was dangerous to run the elevator without a clamp, defendant ordered him to start it, and not longer delay the work. There was evidence that clamps are well-recognized safety devices, and in general use on elevators, and when properly adjusted with such devices that the elevators cannot become detached from the cable and fall.

Early in the afternoon of April 2, 1910, the plaintiff was directed by the carpenter whom he had been assisting in the basement for a week previous to go to the top floor for some nails. He took the elevator, went up, got his hat full of nails, and, starting to return, he stepped onto the north elevator, when it fell with him to the basement. The cable did not break, but simply unwound, became detached, and let the elevator drop. The plaintiff claims that as a result of the fall he sustained serious injuries, that the bones of both legs were broken, and both feet seriously and permanently injured.

The breach of duty alleged in the first count of the declaration was that the defendant negligently failed to furnish proper appliances for the safe operation of the elevator, and particularly a certain clamp to secure the cable, so as to prevent the elevator from falling. The third count was similar, except that it alleged negligence in maintaining the elevator without a clamp. In the second count, the failure of the defendant to warn and apprise the plaintiff of the danger arising from the absence of the clamp is set up, and in the sixth count his negligence in ordering the elevator to be used while in an unsafe condition is alleged.

At the close of plaintiff's evidence, the trial court directed a verdict and judgment for the defendant, assigning as its reason for so doing that, inasmuch as the signs had been posted, which read: "Danger. Keep off"— the plaintiff used the elevator at his own risk, and that as matter of law he assumed the risk.

The plaintiff has brought the case here for review, and the only error assigned is that the trial court erred in directing a verdict and judgment for the defendant.

As we are dealing here with a directed verdict, we have set forth the claim and evidence of the plaintiff in their most favorable aspect.

We are of opinion that the trial court erred in directing a verdict and judgment for the defendant, and that the evidence presented a case which should have been submitted to the jury under proper instructions. We have repeatedly held that if a rule or notice is habitually violated by employés, with the knowledge and acquiescence of the master, or is not enforced, then the rule or notice may be treated as abrogated. *Hunn* v. *Railroad Co.*, 78 Mich. 513–526 (44 N. W. 502, 7 L. R. A. 500); *Ashman* v. *Railroad Co.*, 90 Mich. 567–576 (51 N. W. 645); *Eastman* v. *Railway Co.*, 101 Mich. 597 (60 N. W. 309); *Fluhrer* v. *Railway Co.*, 121 Mich. 212 (80 N. W. 23); *Id.*, 124 Mich. 482 (83 N. W. 149). See, also, 26 Cyc. pp. 1161, 1162. The question of assumed risk was at least one for the jury.

Counsel for defendant urge that the question of assumption of risk is controlled by the cases of *Bennett* v. *Butterfield*, 112 Mich. 96 (70 N. W. 410), and *Ball* v. *Hauser*, 129 Mich. 397 (89 N. W. 49). The above-cited cases are, in our opinion, readily distinguishable from the instant case upon the facts disclosed.

The point is made in defendant's brief, but not urged in oral argument, that one of the grounds for the motion for a directed verdict was that, under section 10216, 3 Comp. Laws, the circuit court of Ingham county was without jurisdiction, as it appeared that plaintiff was a resident of

Gratiot county, and defendant a resident of Muskegon county, at the time of the commencement of the suit, which fact first appeared upon the trial; and that the result reached by the trial court was correct, even if wrong in the reason given for the directed verdict. Counsel cite *Haywood* v. *Johnson*, 41 Mich. 598 (2 N. W. 926), in support of the position. An examination of the case cited will disclose that the question was there raised by motion, supported by affidavit, before pleading. That the question should be so raised, or raised by a plea to the jurisdiction is, we think, very clear. After a defendant in a transitory action has pleaded in bar of the action, and thus submitted himself to the jurisdiction of a court of general jurisdiction, he must be held to have waived the question of jurisdiction of the person. We do not think the point a meritorious one.

For the error pointed out, the judgment of the circuit court is reversed, and a new trial granted.

OSTRANDER, C. J., and BIRD, STEERE, MOORE, MC-ALVAY, BROOKE, and BLAIR, JJ., concurred.